IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ALBERT CURTIS MILLS,     *

    Plaintiff     *

    v     *     Civil Action No. DKC-17-2305

STATE OF MARYLAND, et al.,     *

    Defendants     *
    ***

## MEMORANDUM OPINION

In response to this verified civil rights complaint, Defendants State of Maryland, Maryland Division of Correction, North Branch Correctional Institution (NBCI), Governor Larry Hogan, Secretary Stephen Moyer, and Bruce Liller, MHPM, filed a motion to dismiss or in the alternative for summary judgment. ECF No. 9. Plaintiff filed a response in opposition to the motion.[1] ECF No. 18. The court finds no need for a hearing. *See* Local Rule 105.6 (D.Md. 2016). For the reasons that follow, Defendants' motion, construed as a motion for summary judgment, will be GRANTED.

### I.     BACKGROUND

**A.     Plaintiff's Claims**

Plaintiff Albert Curtis Mills, an inmate committed to the custody of the Maryland Department of Public Safety and Correctional Services (DPSCS) and currently confined in NBCI (ECF No. 1 at p. 1), complains that while he was incarcerated at NBCI, Defendants denied him access to religious services in violation of his First Amendment Free Exercise right; and invokes

---

[1] Plaintiff has also filed a "Repeat Motion for Protective Order" (ECF No. 15) with supplements wherein he complains of mail delay and that he has been threatened with removal from his single cell status in retaliation for his having filed the instant case. ECF Nos. 16, 17, 19, 20, 21, and 22. Plaintiff's previous motions for protective order wherein he also alleged mail tampering were denied. ECF Nos. 4, 14.

without elaboration the Religious Land Use and Institutionalized Person's Act (RLUIPA), the Americans with Disabilities Act (ADA), and the Rehabilitation Act as bases for his claim. ECF No. 1 at p. 12. He seeks injunctive relief directing Defendants to permit his attendance at church services as well as compensatory and punitive damages. *Id.* at p. 15.

Specifically, Plaintiff states that he suffers from mental illness. ECF No. 1 at p. 14. In his sworn complaint, Plaintiff alleges that on August 24, 2014, Chief Psychologist Bruce Liller placed Plaintiff on "Level 1" where he remained until December 6, 2015. ECF No. 1 at p. 7. Plaintiff indicates that his placement on Level 1 prevented him from attending "church services" which as a Christian, he is required to attend. *Id*. at p. 8.

Plaintiff alleges that Governor Hogan is responsible for Stephen Moyer who is responsible for Bruce Liller. ECF No. 1 at p 8. He claims that Governor Hogan and Stephen Moyer knew or should have known about the policy which has existed since 2009. ECF No. 1 at pp. 8-9. Plaintiff also claims that Moyer is responsible for the policy that denies church services to all inmates housed on the special needs unit. *Id*. at p. 9.

Plaintiff claims that he was not required to file an administrative grievance regarding this claim as "medical staff are not Maryland Division of Correction Staff[] so the Maryland Court of Appeals has ruled that the grievance by the prison's administrative remedy procedure is not required." ECF No. 1 at p. 6.

**B.     Defendants' Response**

Defendants provide verified business records, which include Plaintiff's case management notes, along with their declarations under oath in support of their motion. Bruce Liller, Mental Health Program Manager at NBCI and an employee of the DPSCS, avers that staff members of the psychology department assess inmates and provide mental health care. ECF No. 9-3, ¶¶ 1, 3

2

(Liller Decl.). He denies prohibiting Plaintiff from attending church services or from practicing his religion. ECF No. 9-3 at ¶ 9. Liller oversees the Special Needs Unit ("SNU") (*id*. at ¶ 3) which he describes as "a tier developed to house the validly mentally ill who have a qualifying diagnosis and who demonstrate behavioral stability to where they may function within the structure of the program." *Id*. at ¶ 4.

Plaintiff was placed on the SNU in 2009 due to the difficulty he experienced being housed in general population and in light of Plaintiff's unspecified mental health diagnosis and his level of functioning. ECF No. 9-3 at ¶¶ 5-6. After placement on the SNU, Plaintiff's mental health symptoms worsened which resulted in his being designated "as a level two status; a one level reduction as precaution. *Id.* Although rare for inmate Mills (reduction in level), he returned to level 3 after his symptoms remitted." *Id*. at ¶ 5. Liller avers that from August 11, 2014, through August 11, 2017, Plaintiff maintained a level three status. *Id*. at ¶ 6; *see also* ECF No. 9-2 (Case Management Notes).[2] Presumably because Liller denies Plaintiff's assertion that he was assigned to Level 1 during this timeframe, Plaintiff's claim that SNU inmates assigned to Level 1 are categorically denied the opportunity to attend congregate religious services is not directly addressed.

The Special Needs Unit Program Manual (DOC.124.0451) describes the program levels:

Level 1: An inmate on level one will meet the criteria for an SMI diagnosis. This inmate's functioning is impaired to the point of being dangerous or severely disruptive to the functioning of the housing area. Inmates on this level shall be fed in their cells. Their recreation shall be done individually.

Level 2: An inmate on this level will meet the criteria for an SMI diagnosis. The inmate's functioning is impaired in some area of his life. However, the inmate

---

[2] On August 23, 2017, after the filing of this case, Plaintiff's Case Management Notes indicate he was to remain at Level 2. ECF No. 9-2 at p. 8 (Case Management Note 8/23/17). It is unclear when or why Plaintiff was moved from Level 3 to Level 2. The case management notes from October 27, 2016, to July 18, 2017, have not been provided to the court.

3

can function well enough to interact socially with other inmates without posing a danger to others. Inmates on this level may eat either in their cells or the recreation hall as determined by the Special Needs Treatment Team.

Level 3: An inmate on this level is experiencing only mild functional impairment due to mental illness. The inmate will be able to function with minimal staff support in all areas of daily living. Inmates on this level shall eat in the dining room. They will be capable of holding an institutional job and they will be able to maintain their personal hygiene with minimal cues.

ECF No. 9-2 at p. 10.[3]

Liller explains that inmates on Level 3 status enjoy the same movement as inmates in general population; they may request passes for religious worship, access the main library, and receive the same amount of recreation as the general population. ECF No. 9-3 at ¶ 7. Kevin Lamp, Chaplain at NBCI, confirms that inmates housed on the SNU are permitted to practice their religion, but does not specifically address whether Level 1 inmates are permitted to attend congregate religious services. ECF No. 9-4 at ¶ 3 (Lamp Decl.).

Liller describes Plaintiff as "frequently participat[ing in] and coordinat[ing] bible study on the SNU." ECF No. 9-3 at ¶ 8; *see also* ECF No. 9-2 at p. 3 (case management note dated 6/10/15- Plaintiff reports studying the bible); ECF No. 9-2 at pp. 4-5 (case management notes

---

[3] In his response, Plaintiff reiterates his claim that he was placed on Level 1 on or about August 29, 2014 (ECF No. 18 at p. 1-3) and remained there until December of 2014. (*Id*. at p. 7) (In his initial Complaint he alleged he was housed on Level 1 until December of 2015 (ECF No. 1 at p. 8)). He claims he was not permitted to attend religious services, that he has no claim regarding Level 2 programming, and that when he was returned to Level 3 Chaplain Lamp took "a long time to put [him] back on the church list." ECF No. 18 at pp. 7-8. Plaintiff claims that on December 8, 2017, he encountered Liller in the day room and asked him if he had ever been housed on Level 1, to which Liller replied, yes. *Id*. at p. 8. When Plaintiff asked Liller why he lied in this case about his being housed on Level 1, Liller advised Plaintiff that he did not want to discuss the case. *Id*.

Plaintiff also claims that he has copies of his case management notes from August to December of 2014, which would demonstrate that he was housed on Level 1 status. ECF No. 18 at p. 9-10; ECF No. 18-1. Those notes are not a part of the record before this court.

dated 9/2/15 and 11/25/15, Plaintiff reports running a bible study group in the dayroom). On three occasions during his monthly meetings with his therapist (April 2014, July 2014, and August 2014) he indicated his desire to attend church services. ECF No. 9-3 at ¶ 8. Plaintiff was advised that he should contact the Chaplain to request a pass. *Id*. Plaintiff advised his therapist on August 26, 2014, that the issue regarding church services was resolved.[4] *Id*.

Plaintiff's case management notes reflect that he was provided administrative remedy procedure forms. ECF No. 9-2 at pp. 6-7 (case management notes dated 7/12/16 and 8/10/16). Russell Neverdon, Executive Director of the Inmate Grievance Office (IGO) avers that Plaintiff filed one grievance with the IGO concerning the policy limiting the number of books he could bring into the yard.[5] ECF No. 9-5 at ¶ 3a.

## II. STANDARD OF REVIEW

Defendants' motion is styled as a motion to dismiss under Fed.R.Civ.P. 12(b)(6) or, in the alternative, for summary judgment under Fed.R.Civ.P. 56. A motion styled in this manner implicates the Court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *See Kensington Vol. Fire Dept., Inc. v. Montgomery County*, 788 F.Supp.2d 431, 436-37 (D.Md. 2011). Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007). However, under Rule 12(b)(6), a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d). If the court does so, "the motion must be treated as one for summary judgment under Rule 56[,]" and "[a]ll parties must be given a

---

[4] Lamp avers that Plaintiff did not submit any request forms during the period August, 2014, through August, 2017. ECF No. 9-4 at ¶ 4. He further explains that if an inmate fails to attend three consecutive religious services, the inmate loses the pass and must submit a new request form. *Id*. at ¶ 5.

[5] The declaration contains an error at ¶ 3 wherein it misidentifies the Plaintiff. ECF No. 9-5 at ¶ 3.

5

reasonable opportunity to present all the material that is pertinent to the motion." Fed.R.Civ.P. 12(d).

When the movant expressly captions its motion "in the alternative" as one for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998). Because matters outside the pleadings are presented in the Defendants' dispositive motion, it is considered a motion for summary judgment. Fed.R.Civ.P. 12(d).

A motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the burden of showing that there is no genuine issue as to any material fact. However, no genuine issue of material fact exists if the nonmoving party fails to make a sufficient showing on an essential element of his or her case as to which he or she would have the burden of proof. *Celotex*, 477 U.S. at 322-23. Therefore, on those issues on which the nonmoving party has the burden of proof, it is his or her responsibility to confront the summary judgment motion with an affidavit or other similar evidence showing that there is a genuine issue for trial. Summary judgment is appropriate under Rule 56(c) of the Federal Rules of Civil Procedure when there is no genuine issue as to any material fact, and the moving party is plainly entitled to judgment in its favor as a matter of law. In *Anderson v. Liberty Lobby, Inc*., the Supreme Court explained that, in considering a motion for summary judgment, the "judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." 477 U.S. at 249. A

dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. at 248. Thus, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Id*. at 252.

Because Plaintiff is self-represented, his submissions are liberally construed. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). But, the court must also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club*, 346 F.3d 514, 526 (4th Cir. 2003) (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993) (citing *Celotex*, 477 U.S. at 323-24).

### III.     ANALYSIS

**A.     Exhaustion of Administrative Remedies**

Although there are genuine disputes of material fact as to whether Plaintiff was ever housed on Level 1 as he claims, and, if so, whether any impact such assignment had on his religious practices was justified, Defendants raise the affirmative defense that Plaintiff failed to exhaust his administrative remedies and it is undisputed that he in fact failed to do so. As a result, his complaint must be dismissed without prejudice.

A Plaintiff's claims that have not been properly presented through the administrative remedy procedure must be dismissed pursuant to the Prisoner Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a):

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

For purposes of the PLRA, "the term 'prisoner' means any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program." 42 U.S.C. § 1997e(h). The phrase "prison conditions" encompasses "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002); *see Chase v. Peay*, 286 F.Supp.2d 523, 528 (D.Md. 2003), *aff'd*, 98 Fed.Appx. 253 (4th Cir. 2004).[6]

Plaintiff's RLUIPA, ADA, and Rehabilitation Act claims, like all prisoner conditions claims, must be exhausted before they can be brought in federal court. *Tillman v. Allen*, 187 F.Supp.3d 664, 672 (E.D.Va. 2016) (dismissing without prejudice RLUIPA claims for failure to exhaust under the PLRA); *Germain v. Shearin*, 653 Fed.App'x 231 (4th Cir. 2016) (holding inmate who brought claim under RLUIPA failed to exhaust his administrative remedies as required by the PLRA); *Corpening v. Hargrave*, 5:14–cv–122–FDW, 2015 WL 2168907 *2

---

[6] Maryland appellate case law indicates that the administrative grievance procedure does not encompass "'every kind of civil matter that could be brought by a DOC . . . inmate.'" *Massey v. Galley*, 392 Md. 634, 646, 898 A.2d 951, 958 (2006). Rather, it applies only to matters that "relate to or involve a prisoner's 'conditions of confinement.'" *Id*. at 650-51, 898 A.2d at 960. Thus, the grievance procedure does not apply to requests for public information under the Maryland Public Information Act, *see id*., nor does it apply to medical malpractice claims against private medical service providers who treat inmates under contract with the DOC. *See Adamson v. Corr. Med. Servs., Inc*., 359 Md. 238, 250, 753 A.2d 501, 508 (2000).

Moreover, the administrative grievance procedure does not apply to claims for compensation for disabilities resulting from "personal injury arising out of and in the course of [an inmate's] work for which wages or a stipulated sum of money was paid by a correctional facility," Md. Code Ann. Corr. Servs. § 10-304, for which a claim to a different administrative body, the Sundry Claims Board, is the exclusive remedy. *See Dixon v. DPSCS*, 175 Md. App. 384, 408 927 A.2d 445, 459 (2007). On the other hand, the grievance process does apply to a wide variety of claims that arise out of the conditions of confinement, even if the grievance process cannot provide a comprehensive remedy for such claims, such as tort claims of assault and battery against prison officers. *See McCullough v. Wittner*, 314 Md. 602, 552 A.2d 881 (1989).

(W.D.N.C. May 8, 2015) (citing *O'Guinn v. Lovelock Corr. Ctr.*, 502 F.3d 1056, 1060-61 (9th Cir. 2007) (holding that the PLRA requires exhaustion of administrative remedies before an action may be brought under any federal law, including the ADA and Rehabilitation Act).

As noted by the Supreme Court, the exhaustion of administrative remedies is "an important doctrine in both administrative and habeas law," and "is well established in jurisprudence of administrative law." *Woodford v. Ngo*, 548 U.S. 81, 88 (2006) (citations omitted). Essentially, a plaintiff is not entitled to judicial relief until the prescribed administrative remedies have been exhausted. A claim that has not been exhausted may not be considered by this court. *See Jones v. Bock*, 549 U.S. 199, 220 (2007). In other words, exhaustion is mandatory. *Ross v. Blake*, __ U.S. __, 136 S.Ct. 1850, 1857 (2016). Therefore, a court ordinarily may not excuse a failure to exhaust. *Ross*, 136 S.Ct. at 1856-57 (citing *Miller v. French*, 530 U.S. 327, 337 (2000) (explaining "[t]he mandatory 'shall'. . . normally creates an obligation impervious to judicial discretion")).

The PLRA's exhaustion requirement serves several purposes. These include "allowing a prison to address complaints about the program it administers before being subjected to suit, reducing litigation to the extent complaints are satisfactorily resolved, and improving litigation that does occur by leading to the preparation of a useful record." *Bock*, 549 U.S. at 219; *see Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008) (exhaustion means providing prison officials with the opportunity to respond to a complaint through proper use of administrative remedies). It is designed so that prisoners pursue administrative grievances until they receive a final denial of the claims, appealing through all available stages in the administrative process so that the agency reaches a decision on the merits. *Chase*, 286 F.Supp.2d at 530; *Gibbs v. Bureau of Prisons*, 986 F.Supp. 941, 943-44 (D.Md. 1997) (dismissing a federal prisoner's lawsuit for

failure to exhaust, where plaintiff did not appeal his administrative claim through all four stages of the BOP's grievance process); *see also Booth v. Churner*, 532 U.S. 731, 735 (2001) (affirming dismissal of prisoner's claim for failure to exhaust where he "never sought intermediate or final administrative review after prison authority denied relief"); *Thomas v. Woolum*, 337 F.3d 720, 726 (6th Cir. 2003) (noting that a prisoner must appeal administrative rulings "to the highest possible administrative level"); *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002) (prisoner must follow all administrative steps to meet the exhaustion requirement so that the agency addresses the merits of the claim, but need not seek judicial review), *cert. denied*, 537 U.S. 949 (2002).

Ordinarily, an inmate must follow the required procedural steps in order to exhaust his administrative remedies. *Moore*, 517 F.3d at 725, 729; *see Langford v. Couch*, 50 F.Supp.2d 544, 548 (E.D.Va. 1999) ("The. . . . PLRA amendment made clear that exhaustion is now mandatory."). Exhaustion requires completion of "the administrative review process in accordance with the applicable procedural rules, including deadlines." *Woodford*, 548 U.S. at 88, 93. This requirement is one of "proper exhaustion of administrative remedies, which 'means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).'" *Id.* at 91 (quoting *Pozo*, 286 F.3d at 1024) (emphasis in original). But, the court is "obligated to ensure that any defects in [administrative] exhaustion were not procured from the action or inaction of prison officials." *Aquilar-Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th Cir. 2007); *see Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir. 2006).

An inmate need only exhaust "available" remedies. 42 U.S.C. § 1997e(a). In *Ross v. Blake*, 136 S.Ct. 1850 (2016), the Supreme Court rejected a "freewheeling approach to exhaustion as inconsistent with the PLRA." *Id.* at 1855. In particular, it rejected a "special

circumstances" exception to the exhaustion requirement. *Id*. at 1856-57. But, it reiterated that "[a] prisoner need not exhaust remedies if they are not 'available.'" *Id*. at 1855. "[A]n administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it." *Moore,* 517 F.3d at 725.

The Supreme Court stated in *Ross* that an administrative remedy is available if it is "'capable of use' to obtain 'some relief for the action complained of.'" 136 S.Ct. at 1859 (quoting *Booth*, 532 U.S. at 738). Thus, an inmate must complete the prison's internal appeals process, if possible, before bringing suit. *See Chase*, 286 F.Supp.2d at 529-30. As a prisoner, plaintiff is subject to the strict requirements of the exhaustion provisions. *See Porter*, 534 U.S. at 528 (no distinction is made with respect to exhaustion requirement between suits alleging unconstitutional conditions and suits alleging unconstitutional conduct). Exhaustion is also required even though the relief sought is not attainable through resort to the administrative remedy procedure. *See Booth*, 532 U.S. at 741.

The *Ross* Court outlined three circumstances when an administrative remedy is unavailable and an inmate's duty to exhaust available remedies "does not come into play." 136 S.Ct. at 1859. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* Second, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use. In this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." *Id*. The third circumstance arises when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860.

The DPSCS has an established "administrative remedy procedure" ("ARP") for use by Maryland State prisoners for "inmate complaint resolution." *See generally* Md. Code Ann. (2008 Repl. Vol.), Corr. Servs. ("C.S."), §§ 10-201 *et seq.*; Md. Code Regs. ("COMAR") 12.07.01.01B(1) (defining ARP). The grievance procedure applies to the submission of "grievance[s] against . . . official[s] or employee[s] of the Division of Correction." C.S. § 10-206(a).

Regulations promulgated by DPSCS concerning the administrative remedy procedure define a "grievance' to include a "complaint of any individual in the custody of the [DOC] . . . against any officials or employees of the [DOC] . . . arising from the circumstances of custody or confinement." COMAR 12.07.01.01B(8). An inmate "must exhaust" the ARP process as a condition precedent to further review of the inmate's grievance. *See* C.S. § 10-206(b); *see also* COMAR 12.07.01.02.D.

It is undisputed that Plaintiff never instituted or completed the grievance process concerning his claim that he was denied religious services. In his initial Complaint, response to the dispositive motion, and Supplement to the Motion for Protective Order, Plaintiff offers a variety of excuses for his failure to do so. He attached affidavits to each of his submissions. ECF Nos. 1, 17, and 18.

In his initial complaint he explained that he was not required to exhaust his administrative remedies as to this claim because it involved claims against medical staff. ECF No. 1 at p. 6. Contrary to Plaintiff's assertion, his claim does not involve any medical staff nor does it concern the provision of medical services. Rather, Plaintiff objects to a policy enacted by correctional staff which he claims denied him congregate prayer.

In his opposition response, Plaintiff again argues that administrative remedies do not apply to his case because "they are administrative and not medical [and his] medical care is not a part of these remedies of medical staff." ECF No. 18 at p. 12. Plaintiff contends, without explanation, that the NBCI Warden "uses the SNU review for appeal of Level 1" (*id*.), citing a 2000 case from Virginia discussing exhaustion of administrative remedies, and attaching a copy of correspondence received from Warden Bishop dated October 26, 2016. *Id*.

The letter, hand copied by Plaintiff, indicates that the Warden was in receipt of Plaintiff's letter referring to multiple complaints regarding his mental illness and disabilities. The Warden noted that Plaintiff met with the SNU committee every thirty days and had an opportunity to discuss the concerns at that time. ECF No. 18-3 at p. 2. Portions of the letter appear to have been left out by Plaintiff as indicated by ellipses. *Id*. The Warden also advised Plaintiff that he could address additional concerns to his housing unit manager. *Id*. The letter, as reproduced, is silent in regard to administrative remedies. *Id*. The letter does not explicitly state, nor imply, that administrative remedies were not available to Plaintiff. Rather, the letter explained the informal means available to Plaintiff for addressing his concerns.

Plaintiff also maintains that Moyer "uses the SNU for an appeal of Level 1," also citing the letter from Bishop as well as an unreported Virginia case discussing administrative remedies within the Virginia State Prisons. ECF No. 18 at p. 12. Plaintiff states that Hogan uses Moyer to decide cases for him. *Id*. at pp. 12-13. It is unclear how these allegations relate to Plaintiff's clear failure to utilize the administrative grievance process.

In a further effort to justify his failure to utilize the administrative process, Plaintiff states that "these remedies cannot overturn Level 1 decisions because they are not designed to." ECF No. 18 at p. 13. Plaintiff argues that the Warden at NBCI, who is responsible for answering

13

administrative remedies, is not in charge of the clinical part of the SNU so that the clinical part does not apply to the remedies pursuant to DPSCS Directive 124-451.3.B.[7] *Id.* Similarly, Plaintiff argues that the Commissioner, who answers appeals, does not hire medical staff and neither Moyer nor Hogan are "over medical staff for these remedies." *Id.* Plaintiff restates his belief that there is no appeal of a decision to place someone on Level 1 status. *Id.* It is clear however, that Plaintiff's claim does not concern his assignment to Level 1 nor does it concern the mental health care he received while so assigned. Rather, his complaint concerns a policy which he alleges denied him access to religious services while on Level 1. Additionally, as previously noted, Liller is not a medical contractor as Plaintiff alleges but rather is an employee of DPSCS. Clearly, Plaintiff's complaints about Liller's conduct were subject to the grievance process notwithstanding Plaintiff's sincerely held but erroneous belief to the contrary.

Next, in a supplement to his Motion for Protective Order (ECF No. 17) Plaintiff alleges that on unspecified dates the NBCI mail room clerk stole his mail in an effort to try to dismiss his grievances. *Id.* at p. 1. He states that the Inmate Grievance Office has told him on many occasions that they did not get papers from him. He also states that he did not get responses from the Internal Investigation Unit and the United States Postal Service. *Id.* Notably, Plaintiff does not allege that the lost grievances concern the issues raised in this Complaint.

Lastly, in an effort to justify his failure to exhaust administrative remedies, Plaintiff states that on December 13, 2017, four months after filing this complaint,[8] Liller and Sawyer told

---

[7] The court has reviewed DPSCS Directive 124-451 issued December 20, 2000. The directive is silent in regard to the grievance process for SNU inmates in connection with their assignments to Levels 1, 2, or 3.

[8] Additionally, it is noted that Plaintiff complains that he was denied religious services from August 24, 2014 to December 6, 2015. ECF No. 1 at p. 8. Assuming Plaintiff was told in December of 2017, that he was not permitted to utilize the grievance process as a SNU inmate,

him that the administrative remedy procedure did not apply to the SNU and there was no appeal to what they do.[9] ECF No. 17 at p. 1-2; ECF No. 18 at p. 13. Even if true, Plaintiff's effort to exhaust his remedies at that time, after having already filed the instant case would not have saved his filing from dismissal. Exhausting administrative remedies after a complaint is filed will not save a case from dismissal for failure to exhaust administrative remedies. *See Neal v. Goord*, 267 F.3d 116, 121-22 (2d Cir. 2001) (overruled on other grounds). In *Freeman v. Francis*, 196 F.3d 641, 645 (6th Cir. 1999), the court stated: "The plain language of the statute [§ 1997e(a)] makes exhaustion a precondition to filing an action in federal Court. . . . The prisoner, therefore, may not exhaust administrative remedies during the pendency of the federal suit." *See Kitchen v. Ickes*, 116 F.Supp.3d 613, 625 (D.Md. 2015); *see also Blackburn v. S.C.*, 0:06-2011-PMD-BM, 2009 WL 632542, at *1 (D.S.C. Mar. 10, 2009), *aff'd*, 404 F. App'x 810 (4th Cir. 2010); *Kaufman v. Baynard*, 1:10-0071, 2012 WL 844480 (S.D.W.Va. Feb. 3, 2012) *report and recommendation adopted*, 1:10-0071, 2012 WL 844408 (S.D.W.Va. Mar. 12, 2012); *Miller v. McConneha, et al*, JKB-15-1349, 2015 WL 6727547, at *3-4 (D.Md. November 11, 2015).

Plaintiff's mistaken belief that he was not required to exhaust administrative remedies is not the type of explanation the *Ross* Court recognized as excusing a failure to exhaust. First, Plaintiff did not reach a dead end in the administrative process, rather he chose not to participate in the process. Secondly, the process provided by NBCI for inmate grievances is not so incomprehensible that no reasonable inmate could understand it. Lastly, Plaintiff's failure to utilize the grievance process in 2014 or 2015 was not the result of any misconduct on the part of

---

he fails to explain why he did not utilize the process in 2014 or 2015 while he was being denied access to religious services.

[9] Notably, Plaintiff does not affirm what if any impact this statement had on him, *e.g.*, that their statement caused him to abandon an effort to pursue administrative remedies or was the reason for his mistaken belief in 2014 that the administrative process was not available to him.

NBCI employees. Rather, Plaintiff erroneously believed that he did not need to exhaust his claims. Thus, despite the existence of a possible genuine dispute of material fact regarding whether or not Plaintiff was assigned to Level 1 during the operative timeframe and whether that assignment alone meant that he was denied congregate worship, this court is precluded from reaching the merits of the underlying claim due to Plaintiff's failure to exhaust the claim. As a result, the Complaint must be dismissed without prejudice.

**B.      Injunctive Relief**

In his "Repeat Motion for Protective Order" (ECF No. 15) as supplemented (ECF Nos. 16, 17, 19, 20, 21, and 22), Plaintiff seeks injunctive relief with respect to his claim of mail tampering and retaliatory transfer as well as his claim that his First Amendment right to free exercise of religion is infringed.

Plaintiff's claims of retaliation are raised for the first time in these motions. Plaintiff states NBCI staff Liller, Sawyers, Forney, Harr and Sidney demanded Plaintiff "chill" his rights. ECF No. 15 at p. 1. He claims that they threatened to transfer him in order to stop his case and that the only reason they do this is because of his case. *Id*. Plaintiff alleges that Liller, Sawyers, Forney, Harr and Sidney told him he would be removed from the SNU if he did not drop his case. *Id.*

Although Plaintiff has not specifically sought leave to amend his complaint, the court observes that such leave to amend must be freely given under Fed.R.Civ.P. 15. Leave to amend may, however, be denied where the proposed amendment would be prejudicial to the opposing party, or the moving party has acted in bad faith, or the amendment would be futile. *See Equal Rights Ctr. v. Niles Bolton Assoc.*, 602 F.3d 597, 603 (4th Cir. 2010). A proposed amendment is prejudicial to the opposing party if it is belated and would change the nature of the litigation. *Id*.

at 604; *see also Deasy v. Hill*, 833 F.2d 38, 42 (4th Cir. 1987). To the extent, Plaintiff seeks to amend his Complaint, the proposed amendment is prejudicial given its late filing and naming of additional Defendants. If Plaintiff believes he has been retaliated against for having filed this Complaint he is free to file a new civil rights complaint setting forth those allegations and specifying the names of Defendants, their specific conduct, and what relief he seeks.

Moreover, injunctive relief would be inappropriate in the pending case, not simply because it will be dismissed. A preliminary injunction is an extraordinary and drastic remedy. *See Munaf v. Geren,* 553 U.S. 674, 689–90 (2008). A party seeking a preliminary injunction or temporary restraining order must establish the following elements: (1) a likelihood of success on the merits; (2) a likelihood of suffering irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the party's favor; and (4) why the injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc*., 555 U.S. 7, 20 (2008). As to irreparable harm, the movant must show the harm to be "neither remote nor speculative, but actual and imminent." *Direx Israel, Ltd. v. Breakthrough Med. Corp.,* 952 F.2d 802, 812 (4th Cir. 1991) (citation omitted). In the prison context, courts should grant preliminary injunctive relief involving the management of correctional institutions only under exceptional and compelling circumstances. *See Taylor v. Freeman*, 34 F.3d 266, 269 (4th Cir. 1994). "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the Supreme Court's] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22 (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (*per curiam*)).

Plaintiff complains that his mail has been tampered with. He states that NBCI mail clerk MJ Rose steals his mail in an effort to dismiss his grievances. ECF No. 17 at p. 1. The court

observes that Plaintiff has filed an opposition to the dispositive motion as well as numerous letters and correspondence with the court, which suggests that no one is interfering with his mail. Plaintiff has failed to demonstrate the likelihood of success on the merits of his mail tampering claim because he has not alleged an actual injury such as the loss of an opportunity to litigate a meritorious claim. To the extent the alleged efforts to have his grievances dismissed through mail theft were successful, Plaintiff has not sustained a legally cognizable injury absent an allegation that the grievance concerned a matter likely to result in an award of relief for the claim asserted therein. *See Lewis v. Casey*, 518 U.S. 343, 355 (1996) (unconstitutional burden on right of access to courts requires showing of actual injury).

Similarly, Plaintiff's claim that he has been threatened with a retaliatory transfer from his single cell due to his having filed the instant case entitles him to no relief. As previously noted, "[i]ssuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the Supreme Court's] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22 (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (*per curiam*)).

Additionally, bare or conclusory assertions of retaliation are insufficient to establish a retaliation claim. *See Adams v. Rice*, 40 F.3d 72, 74 (4th Cir. 1994). An inmate must allege facts showing that his exercise of a constitutionally protected right was a substantial factor motivating the retaliatory action. *See, e.g., Cochran v. Morris,* 73 F.3d 1310, 1318 (4th Cir. 1996). Plaintiff's bare and conclusory assertion of retaliation is readily distinguishable from the assertions in *Booker v. South Carolina Dep't of Corrections*, 855 F.3d 533, 545 (4th Cir. 2017). In *Booker,* the United States Court of Appeals for the Fourth Circuit ruled an inmate's "detailed factual allegations" concerning disciplinary charges brought against him after he threatened suit

against a mailroom supervisor for tampering with his mail constituted a colorable retaliation claim. *Id*. at 540. Plaintiff has not alleged any facts which indicate he is entitled to a preliminary injunction. He has failed to demonstrate a likelihood of success on the merits, the likelihood of irreparable harm, or that the balance of equities tip in his favor.

Lastly, Plaintiff's request for injunctive relief concerning his free exercise claims are also unavailing. He has failed to demonstrate that the requested injunctive relief is necessary to avoid irreparable harm. The undisputed evidence presented to the court demonstrates that Plaintiff is not currently housed on Level 1 and is permitted to attend religious services as would any other inmate and is provided access to religious materials. Accordingly, the request for injunctive relief is denied.

## IV. CONCLUSION

Plaintiff's complaint is dismissed without prejudice for failure to exhaust administrative remedies.[11] A separate Order follows.

/s/
DEBORAH K. CHASANOW
United States District Judge

---

[11] In light of the foregoing, the court need not address Defendants' immunity defenses.